UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 15-cv-3153 (RER)

———————————

DONALDO A. TORRENEGRA,

Plaintiff,

VERSUS

GRAMEEN AMERICA, INC. AND GRAMEEN AMERICA NY, INC.,

Defendants.

———————————

**Memorandum & Order**

April 19, 2017

———————————

**RAMON E. REYES, JR., U.S.M.J.:**

Donaldo A. Torrenegra ("Plaintiff") commenced this action against Grameen America, Inc., ("Grameen America") and Grameen America NY, Inc. ("GANY") (collectively "Defendants") alleging failure to pay overtime wages as required under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 207, and New York Labor Law § 651 ("NYLL"). (Dkt. No. 1). Plaintiff now moves for partial summary judgment, pursuant to Fed. R. Civ. P. 56, requesting that this Court strike Defendants' seventh affirmative defense, which claims Plaintiff is an exempt employee not entitled to overtime pay. (Dkt. No. 53-1 (Plaintiff's Memorandum in Support of Summary Judgment ("Pl. Br.") at 1). Defendants cross move for summary judgment on the grounds that: (1) Plaintiff failed to present sufficient evidence that he worked in excess of 40 hours per week; (2) Plaintiff presented no evidence that GANY was his employer during the relevant time period; and (3) Plaintiff is an exempt employee under either the administrative exemption, the outside salesman exemption, or a combined exemption. (Dkt. No. 51-1 (Defendants' Memorandum in Support of Summary Judgment ("Df. Br.")) at 13, 24-26, 30). For the reasons set forth herein, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's motion is DENIED in its entirety.

**BACKGROUND**

The Grameen Bank of Bangladesh (the "Grameen Bank") is an internationally

1

recognized micro-finance institution that provides small dollar loans and other financial services to impoverished Bangladeshi women. (Dkt. No. 53-2 (Plaintiff's Local Civil Rule 56.1 Statement ("Pl. R. 56.1")) ¶ 3; Dkt. No. 54-2 (Defendants' Counterstatement of Undisputed Material Facts ("Dfs. 56.1 Counter")) ¶ 3). Following its creation by Dr. Muhammed Yunus, the Grameen Bank pioneered new methods of directing capital to individuals long excluded from the formal economy, earning Dr. Yunus a Nobel Prize. (Pl. R. 56.1 ¶ 3; Dkt. No. 51-16 (Declaration of Andrea Jung ("Jung Decl.")) ¶ 2, Ex. A-C). Grameen America, a non-profit organization also founded by Dr. Yunus, opened its first New York branch in Jackson Heights, Queens in early 2008. (Pl. R. 56.1 ¶ 5; Dfs. 56.1 Counter ¶ 5). GANY was subsequently formed in mid-2010. (Dkt. No. 51-13 (Juffa Decl. 1 Ex J - NYS Dep't of State Entity Information)).

Plaintiff worked at Grameen America's Jackson Heights branch from December 2008, through early January 2015. (Pl. R. 56.1 ¶¶ 75, 77; Dfs. 56.1 Counter ¶¶ 75, 77). He was initially employed as a Trainee Center Manager ("TCM"), before being promoted to Center Manager ("CM") in December 2009. (Pl. R. 56.1 ¶¶ 78, 80; Dfs. 56.1 Counter ¶¶ 78, 80). In 2010 he was briefly designated as a Second Signatory ("SS"), before returning to his CM position in 2011. (Pl. R. 56.1 ¶¶ 82, 84; Dfs. 56.1 Counter ¶¶ 82, 84). At some point in February or March of 2014 Plaintiff was again reclassified, this time being transferred to the audit team, before his ultimate termination on January 9, 2015. (Pl. R. 56.1 ¶¶ 84-86; Dfs. 56.1 Counter ¶¶ 84-86; Dkt. No. 51-6 (Declaration of Laura B. Juffa "Juffa Decl. 2") Ex C - Deposition of Donaldo A. Torrenegra ("Torrenegra")) 27:14-29:4). The parties dispute whether this transfer constituted a demotion. (Dfs. 56.1 Counter ¶ 85).

I.   **Grameen America's Lending Model**

Grameen America applies the Grameen Bank's micro-finance model to low income women in the United States. (Pl. R. 56.1 ¶ 5; Dfs. 56.1 Counter ¶ 5). Consistent with its mission, Grameen America "provides financial services, financial training and loans to a targeted population of impoverished individuals, especially poor immigrant women, living below the poverty line[.]" (Pl. R. 56.1 ¶ 2; Dfs. 56.1 Counter ¶ 2). According to Andrea Jung, Grameen America's President and CEO, the organization's mission includes: (1) "help[ing] its clients achieve opportunities for entrepreneurship through microloans…[(2)] creat[ing] a culture of savings and individual financial responsibility; (3) improv[ing] its borrowers credit scores to allow [them] to participate in the mainstream American economy; and (4) provid[ing] financial education[.]" (Jung Decl. ¶3).

To facilitate this mission, Grameen America recruits members from the local community who receive training, are formed into groups and then centers, and ultimately become borrowers. Throughout this process, CMs act as the primary point of contact between Grameen America and its members.[1] (Pl. R. 56.1 ¶¶ 95-96; Dfs. 56.1 Counter ¶¶ 95-96). According to Plaintiff,

---

[1] TCMs perform the same function as CMs, but receive additional training and maintain fewer members. (Pl. R. 56.1 ¶ 61; Dfs. 56.1 Counter ¶ 61). SSs also fulfill CM duties but are additionally responsible for a variety of other "duties at the branch office." (Pl. R. 56.1 ¶ 64; Dfs. 56.1 Counter ¶ 64). Due to these extra duties, SSs maintain even fewer members than TCMs. (Pl. R. 56.1 ¶ 65; Dfs. 56.1 Counter ¶ 65).

2

CM duties must be carried out in accordance with Grameen America's "strict criteria, rules, and procedures", and CMs are required to follow "specific guidelines" from which they may not deviate. (Pl. R. 56.1 ¶¶ 14-15, 98; *see generally* Dkt. No. 53-14 (Declaration of Justin M. Reilly ("Reilly Decl.") Ex. K - Grameen America Manual); Torrenegra 187:25-188:12). Defendants dispute this claim, arguing that "recruiting Grameen's members is unique to each Center Manager", that the assessment of who to recruit is "made by the Center Manager and is based on his or her independent discretion and judgment", and that Grameen America guidelines are either minimal or more analogous to proposals (Dfs. 56.1 Counter ¶¶ 14-15; Dkt. No. 51-8 (Juffa Decl. Ex E - Deposition of Alethia Mendez ("Mendez")) 18:2-12, 48:24-49:13). As detailed below, Plaintiff's own testimony supports Defendants' argument.

### A. Recruitment

CMs are responsible for identifying and recruiting new members for Grameen America. (Pl. R. 56.1 ¶¶ 95-96; Dfs. 56.1 Counter ¶¶ 95-96). Members are recruited via direct outreach, with CMs approaching potential members in the community and engaging in direct, face-to-face, conversation. (Torrenegra 31:21-24). The CM explains the Grameen America model, answers questions, and assesses whether the individual would make a suitable member. (Df. R. 56.1 ¶ 19; Torrenegra 187:25-188:18). The CM must also assess the individual's poverty level to ensure they fall within Grameen America's target demographic. (Dkt. No. 51-12 (Center Manager Designation) at 2).

In describing recruitment, Plaintiff testified that he would visit various small businesses, he particularly liked hair salons, where he might find women to approach. (Torrenegra 30:11-20). He also placed a poster in his church lunch room. (Torrenegra 30:11-20). Once a potential member was identified, he would explain the program and assess their interest. (Torrenegra 33:8-17). These conversations could last anywhere from one hour to ninety minutes. (Torrenegra 33:18-25). The degree of freedom Plaintiff exercised is disputed. Defendants' cite Plaintiff's own testimony to support the argument that CMs are free to decide where and how to recruit new members. (Torrenegra 38:24-39:3; Ortega Decl. ¶ 7). Plaintiff, by contrast, argues that CMs are required to follow Grameen America procedures. (Pl. R. 56.1 ¶¶ 14-15, 98; Grameen America Manual; Torrenegra 187:25-188:12; Dfs. 56.1 Counter (Disputing these claims)). At his deposition, Plaintiff testified that Grameen America provided minimal training, no formal script, and limited marketing material. (Torrenegra 33:7-11, 34:1-9; Dkt. No. 51-23 (Grameen America Training Documents)). He did not suggest Grameen America instructed him to recruit from specific locations or at specific times.

### B. Training & Center Formation

Once recruited, potential members are organized into groups. (Pl. R. 56.1 ¶ 16-17; Dfs. 56.1 Counter ¶¶ 16-17). Grameen America requires five members per group. (Pl. R. 56.1 ¶ 16-17; Dfs. 56.1 Counter ¶¶ 16-17 (stating that "the Grameen methodology proposes…5 Members" but "[s]ome Groups have less than 5 members.")). At this point, the CM leads the group through five days of Continuous Group Training. (Pl. R. 56.1 ¶ 19; Dfs. 56.1 Counter ¶ 19). The subject matter of each day's training is proscribed by Grameen America, and includes discussions on topics including, but not limited to: (1) Grameen America's objectives; (2) criteria

3

for membership; (3) the importance of financial discipline; (4) the socio-economic role of group centers; (5) loan products and interest rates; (6) loan proposal procedures; (7) savings products; (8) keeping accounts for loan and savings transactions; and (9) loan utilization. (Grameen America Manual at 8-10). Each day the CM also collects money from each potential member, which is deposited in savings accounts the CM opens for prospective members at a third party institution. (Grameen America Manual at 8; Torrenegra 41:20-25). There is no indication that CMs followed a set script or were provided with detailed guidance on how to approach each topic.

According to Plaintiff, as training progressed he would visit prospective members homes to assess whether they fit the Grameen America model and if the information on their application, relating to income and business plans, was accurate. (Pl. R. 56.1 ¶ 20; Dfs. 56.1 Counter ¶ 20; Torrenegra 34:22-25) ("Then I have to visit their houses or if they have a different business. I have to make sure that whatever they're telling us is true.")).

Once training is completed, the group must be formally recognized. (Pl. R. 56.1 ¶ 21; Dfs. 56.1 Counter ¶ 21). This requires a Grameen America Branch Manager ("Branch Manager") to conduct a Group Recognition Test ("GRT"), where prospective members must demonstrate what they have learned during training. (Pl. R. 56.1 ¶¶ 21, 23; Dfs. 56.1 Counter ¶ 21, 23; Dkt No. 54-1 Juffa Decl. Ex. Q (Rules and procedures for GAI Operations ("Grameen Rules") ¶¶ 5.1-5.4)). The CM is not permitted to conduct a GRT. (Pl. R. 56.1 ¶ 22; Dfs. 56.1 Counter ¶ 22).

C. Center Meetings & Loans

Recognized groups join together to form centers, which hold weekly meetings attended by their CM. (Pl. R. 56.1 ¶¶ 24, 26; Dfs. 56.1 Counter ¶¶ 24-26). According to Defendants, the CM is responsible for providing ongoing educational and business advice, receiving loan requests, collecting loan payments, and facilitating communication between members. (Dkt. No. 51-2 (Defendants' Local Civil Rule 56.1 Statement ("Dfs. R. 56.1")) ¶¶ 26, 30-31; Juffa Decl. Ex F - Deposition Transcript of Andrea Jung ("Jung") ¶¶ 15-17). The CM also continues to collect money for deposit in member's savings accounts and assess loan utilization. (Torrenegra 73:10-13; Ex. Q - Rules and procedures for GAI Operations ¶ 6.5). Plaintiff disputes these facts as misrepresentations of testimony seeking to inflate the scope of the CM role. (Dkt. No. 51-29 (Plaintiff's Counterstatement of Undisputed Facts ("Pl. 56.1 Counter")) ¶¶ 26, 30-31).

New York City branch offices offer borrowers a basic loan. (Pl. R. 56.1 ¶ 29; Dfs. 56.1 Counter ¶ 29). To receive a loan, members must attend all center meetings. (Pl. R. 56.1 ¶ 27; Dfs. 56.1 Counter ¶ 27). Loan applications are presented at center meetings, and all center members must recommend making the loan. (Pl. R. 56.1 ¶¶ 27, 41; Dfs. 56.1 Counter ¶¶ 27, 41). Provided the loan criteria is met, members may apply for subsequent loans by following the same procedure. (Pl. R. 56.1 ¶¶ 36, 38; Dfs. 56.1 Counter ¶¶ 36, 38). Grameen America dictates the maximum size of first, second, and third loans, (Pl. R. 56.1 ¶¶ 32-33; Dfs. 56.1 Counter ¶¶ 32-33 (disputing the size of the maximum loan)). According to Plaintiff, the CM can recommend reducing the size of a loan. (Pl. R. 56.1 ¶ 42; Dfs. 56.1 Counter ¶ 42 (stating that the CM can also recommend

4

increasing the size of a loan)). Defendants claim that the CM must review the loan proposal, recommend the loan amount, and sign the proposal before it is presented to the Branch Manager. (Df. R. 56.1 ¶¶ 27-28; Pl. 56.1 Counter ¶¶ 27-28 (stating the CM must sign the loan proposal but denying this constitutes a recommendation); Torrenegra 72:7-9). Ultimately the loan must be approved by a Branch Manager, not the CM. (Pl. R. 56.1 ¶ 44; Dfs. 56.1 Counter ¶ 44).

## II.    Additional Responsibilities

In addition to managing members, TCMs, CMs, and SSs may also be responsible for certain office tasks. The parties agree that CMs recorded "collection sheet information into a loan ledger." (Df. R. 56.1 ¶ 37; Pl. 56.1 Counter ¶ 37). According to Defendants, in addition to maintaining transaction records CMs physically distributed checks to borrowers. (Df. Br. at 9-10).

SSs have greater office responsibilities. Defendants claim that SSs keep daily transaction accounts, prepare monthly, bi-annual, and annual financial statements, and review TCM/CM account entries and deposits. (Df. R. 56.1 ¶¶ 43-45 Ex. D - Deposition Testimony of Nayroby Sena 148:17-20). Plaintiff denies this, claiming that Branch Managers are responsible for the branch's accounting. (Pl. R. 56.1 Counterstatement ¶ 43). Defendants further claim that "an SS's responsibilities include: maintaining accurate daily accounts for all monetary transactions within a branch[,]" yet another claim Plaintiff asserts is inaccurate. (Df. R. 56.1 ¶ 43; Pl. 56.1 Counter. ¶ 43).

## **DISCUSSION**

A party seeking summary judgment bears the burden of establishing that "there is no genuine dispute as to any material fact and [it is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The movant may satisfy this burden by presenting undisputed evidence or, where the nonmovant "will bear the ultimate burden of proof at trial[, by] point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga*, 51 F.3d at 18; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to present evidence of a genuine dispute of material fact that will call the movant's right to judgment into question. *See United States v. Rem*, 38 F.3d 634, 643 (2d Cir. 1994). This requires the nonmovant to present actual evidence such as "depositions, documents…or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp.*, 477 U.S. at 324. If the evidence, viewed in the light most favorable to the nonmoving party, is such that a "jury could reasonably find for the [nonmovant,]" the motion must be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I.    Overtime Eligibility

To maintain a claim for unpaid overtime under the FLSA and NYLL, Plaintiff must prove that he worked in excess of forty hours per week while employed by the Defendants.[2] 29 US.C. § 207(a); NYLL § 651. Defendants argue that: (1) Plaintiff has failed to meet his burden of proof regarding the number of hours worked; and (2) GANY

---

[2] The FLSA contains additional requirements not disputed here.

5

was never Plaintiff's employer. (Df. Br. at 20, 30). The undisputed facts establish that Plaintiff has met his burden with regard to the hours requirement but not with regard to the employer requirement.

### A.   Average Hours Worked

Employees who work in excess of forty hours per week must receive overtime pay. 29 US.C. § 207(a); NYLL § 651. It is the plaintiff's burden to prove how many hours they worked per week. *See Hosking v. New World Mortg., Inc.*, 570 Fed.Appx. 28, 31 (2d Cir. 2014) (summary order). If the defendant employer fails to maintain adequate time logs or records, however, this burden may be satisfied with minimal evidence such as the plaintiff's own testimony. *See id.* This testimony may be based entirely on the plaintiff's best memory, even if it is imprecise. *See Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). However, the plaintiff must still "produce[] sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference." *Hosking*, 570 Fed.Appx. at 31 (Internal Quotations Omitted). The plaintiff must also show "that the employer had actual or constructive knowledge of that work." *Kuebel*, 643 F.3d at 362. The burden then shifts to the defendant employer to prove no overtime violation occurred, either through direct evidence or "evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

During the course of his employment, Plaintiff primarily worked outside the office and had no set work schedule. (Pl. R. 56.1 ¶ 87; Dfs. 56.1 Counter ¶ 87). He was never required to punch in or out of work, or otherwise record his work hours. (Pl. R. 56.1 ¶¶ 90, 92; Dfs. 56.1 Counter ¶¶ 90, 92). As such, Plaintiff's burden at this stage is minimal. Plaintiff testified that he generally worked between 11 and 13 hours per day. (Pl. R. 56.1 ¶¶ 88-89). Defendants argue that Plaintiff's evidence does not create a "reasonable inference" because his testimony was vague. (Df. Br. at 26-27; Dfs. 56.1 Counter ¶¶ 88-89). Plaintiff's testimony reflected wide variations on his working hours. (Torrenegra 35:12-17; 76:11-78:23). He was also unable to recall the number of members or centers he was responsible at various times. (Torrenegra 40:13-21; 76:11-79:21). Absent such information, Defendants argue, there is no basis for determining the number of hours Plaintiff actually worked.

Despite the vagueness of Plaintiff's testimony, it is sufficient to create a genuine dispute of fact as to the hours he worked. To perform his job, Plaintiff had to meet with community members whenever and wherever they were available. This would naturally result in variations in his schedule. Defendants attempt to negate the reasonableness of Plaintiff's claims with evidence that Plaintiff did not need to work in excess of 40 hours per week and that other CMs regularly completed their work in less time. (Ortega Decl. ¶¶ 10, 13; Mendez Decl. ¶¶11-12). The fact that other employees claim to have worked fewer hours at best represents a dispute of material fact, which affords Defendants no basis on which to seek summary judgment. Nor is there an issue of constructive notice. Plaintiff testified that he complained about his hours to management. (Torrenengra 148:24-149:9, 152:24-153:2). As such, Defendants' motion for summary judgment on this issue is denied.

### B.   GANY Employment

Defendants admit that Grameen America was Plaintiff's employer within the

6

meaning of the statutes. (Df. Br. at 30). However, they contend that Plaintiff has failed to offer evidence that GANY was also his employer. The existence of an employer/employee relationship is assessed based on "economic reality," not "technical concepts" or labels. *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013). The plaintiff bears the burden of establishing this relationship. *See Mahoney v. Amekk Corp.*, 14 Civ. 4131 (ENV) (VMS), 2016 WL 6585810, at * 10 (E.D.N.Y. Sept. 30, 2016).

Plaintiff has failed to satisfy his burden. Plaintiff presents no evidence of the relationship between either himself and GANY or Grameen America and GANY. The most substantive piece of information presented is that GANY was formed in 2010, almost two years after Plaintiff began working for Grameen America. At no point does Plaintiff state what work, if any, he performed for GANY. Throughout his deposition Plaintiff consistently refers to his employer as Grameen or Grameen America, but never GANY. Plaintiff further states that he was paid exclusively by Grameen America. Based on these facts, and the absence of conflicting evidence in the record, I conclude that Plaintiff has not meet his statutory burden of showing that GANY was his employer. As such, the claim against GANY must be dismissed.

## II. Overtime Wage Exemptions

Under the FLSA, employers are not required to pay overtime to "any employee employed in a bona fide…administrative…capacity…or in the capacity of outside salesman[.]" 29 U.S.C. § 213(a)(1). Grameen America argues that Plaintiff is exempt from the FLSA's overtime requirements as either an administrative employee, an outside salesman, or under a combined exemption. (Df. Br. at 13, 24-25).

These exemptions are incorporated into NYLL. NYLL § 651(6); *see also Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). Whether an employee falls within an exemption is a mixed question of law and fact. *See Paganas v. Total Maint. Sol., LLC*, --F.Supp.3d--, 15-CV-5424, 2016 WL 7048034, *5 (E.D.N.Y. Dec. 5, 2016).

The employer "bears the burden of proving that its employees fall within [an] exemption." The employee's "job title alone is insufficient" to meet this burden, 29 C.F.R. § 541.2, and courts must look to the employee's actual duties, *see Gold v. New York Life Ins. Co*, 730 F.3d 137, 145 (2d Cir. 2013). Due to the FLSA's remedial nature, "[e]xemptions for the FLSA's requirements 'are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531 (2d Cir. 2009) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 3 L.Ed.2d 393 (1960)); *see also Reiseck*, 591 F.3d at 104.

Employees are commonly called upon to perform a wide range of tasks, some of which are within an exemption and some of which are not. The employee's primary duty is determinative of whether the administrative or outside salesman exemption applies. 29 C.F.R. §§ 541.200, 541.500.

An employee's primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Several factors help delineate between primary and ancillary duties, including "the relative importance of the exempt duties as compared with other types of duties [and] the amount of time spent

performing exempt work." 29 C.F.R. § 541.700(a).

As a TCM and CM, Plaintiff's primary duty was either selling loans or acting as a community organizer.[3] Based on the facts presented, a reasonable jury could conclude that Plaintiff's primary duty was selling Grameen America's single product, the basic loan. Many of the tasks Plaintiff performed are directly related to selling this product, including recruiting potential borrowers and facilitating loan applications. This suggests that selling loans was a priority. It further suggests considerable time was dedicated to each sale, as much as an hour and a half pitching each potential borrower just to start the process. The relative importance and time spent facilitating new loans is consistent with a finding that this was Plaintiff's primary duty.

Grameen America's retention and promotion policies reinforce this view. According to Plaintiff, promotion and retention was based exclusively on the number of members a CM recruited and retained. After being hired, a TCM was given one year to reach 225 members. (Pl. R. 56.1 ¶ 52; Dfs. 56.1 Counter ¶ 52). If the TCM was successful, they were expected to reach 400 members, and could be subject to demotion if their numbers dropped back below 225 members. (Pl. R. 56.1 ¶ 59; Dfs. 56.1 Counter (admitting a target of 400 members but denying that failure to reach this goal might result in demotion)). These targets are reflected in Grameen America's employment documents, which also establish target loan repayment rates of 95%. (Center Manager Designation at 2). While acknowledging these target numbers, Grameen America claims they are only one of several factors used to determine promotion and retention. (Df. R. 56.1 ¶ 21). Even crediting Grameen America's argument, it is clear that member recruitment and loan repayment were key factors in any determination. This fact further reinforces the argument that Plaintiff's primary duty was selling loans.

Based on the same facts, however, a jury might also conclude that Plaintiff's primary duty was to act as a community organizer. While loan repayment rates are a factor in promotion, the primary factor appears to be member recruitment and retention. Such recruitment, while essential for generating loans, is also essential for community organizing. This target could also evidence Grameen America's prioritization of the number of community members engaged, educated, and organized.

Community organizing may have been a more important and time consuming task. Plaintiff spent considerable time recruiting members, but he also spent large amounts of time training potential members and facilitating center meetings. In support of this view, Defendants have provided affidavits from former CMs stating that their primary duty was to act as a community organizer or educator. (Ortega Decl. ¶ 4 ("My work at Grameen goes beyond recruiting borrowers and collecting loans, it is about bringing a community together and out of poverty."); Mendez Decl. ¶ 5 ("The core responsibilities of the TCM and CM roles is that of a teacher.")). This is consistent with

---

[3] Plaintiff's primary duty may also have been a combination of these duties. Under 29 C.F.R. § 541.708, the so called combined exemption, "[e]mployees who perform a combination of exempt duties" may still be exempt. This exemption applies where some of the employee's duties fall under one exemption and other duties fall under another. *Id.*

Combined, these must still represent the employee's primary duty. *See Callari v. Blackman Plumbing Supply, Inc.*, 998 F.Supp.2d 261, 276-77 (E.D.N.Y. 2014). This is merely an alternative means of satisfying the primary duty test. *See Kadden v. VisuaLex, LLC*, 910 F.Supp.2d 523, 537 (S.D.N.Y. 2012).

their argument that the purpose of member recruitment was not traditional lending but rather community organizing and education.

Regardless of whether Plaintiff's primary duty as a TCM and CM was selling loans or acting as a community organizer, he falls within one of the exemptions, or a combination of both.

### A. TCM & CM's Primary Duty As Selling Loans

If Plaintiff's primary duty was selling Grameen America loans, his work falls within the outside salesman exemption.

#### 1. *Defendants have not waived this exemption*

As an initial matter, there is a question as to whether Defendants waived this exemption by failing to raise it in their pleadings. In answering a complaint, defendants "must affirmatively state any avoidance or affirmative defense[.]" Fed.R.Civ.P. 8(c). While Defendants did not expressly raise the outside salesman exemption in their pleadings, their answer is sufficiently broad to encompass the defense. (Dkt. No. 13 ¶¶ 94, 95, 104). To the extent the answer does encompass this exemption, this Court interprets Defendants motion for summary judgment as containing an implicit motion to amend the pleadings.

Pursuant to Rule 15(a)(2), a "court has discretion, when a party omits a defense, to nevertheless allow the defense at any time 'when justice so requires.'" *Trs. of ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*, 127 F.Supp.2d 475, 478-79 (S.D.N.Y. 2001) (quoting Fed.R.Civ.P. 15(a)). Further, a "district court may…construe a motion for summary judgment as a motion pursuant to [Rule] 15(a) for leave to amend the defendant's answer." *Anthony v. City of N.Y.*, 339 F.3d 129, 138 n.5 (2d Cir. 2003).

### B. *The Outside Salesman Exemption*

The FLSA exempts "any employee [employed] in the capacity of outside salesman[.]" 29 U.S.C. § 213(a)(1). This exemption applies to "any employee: (1) Whose primary duty is (i) making sales…, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer, and (2) Who is customarily and regularly engaged away from the employer's place…of business in performing such primary duty." (a). NYLL applies functionally the same definition. *See Gold*, 730 F.3d at 145. The outside salesman exemption extends to promotional work intended to increase the employee's own sales. *See* 29 C.F.R. § 541.503(a) ("Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work."). In applying this exemption, commonly considered factors include: (1) if the employee is paid a commission; (2) how much supervision is exercised over the employee; (3) how much time is spent working outside the office; (4) if the employee independently solicits new clients; and (5) whether the work is unsuitable to an hourly wage. *See Flood v. Just Energy Mktg. Corp.*, 7:15-cv-2012 (KBF), 2017 WL 280820, at *4 (S.D.N.Y. Jan. 20, 2017); *see also Kinney v. Artist & Brand Agency LLC*, No. 13cv8864 (LAK) (DF), 2015 WL 10714080, at *12 (S.D.N.Y. Nov. 25, 2015).

Of these factors the most important are the first and last: payment of commissions and suitability of the work to an hourly wage.

Application of the outside salesman exemption should be limited to jobs within the meaning and spirit of the FLSA. *See Davis*, 587 F.3d at 531. The outside salesman "exemption is premised on the belief that exempt employees typically earn[] salaries well above the minimum wage and enjoy[] other benefits that set them apart from the nonexempt workers entitled to overtime pay." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S.Ct. 2156, 2173,183 L.Ed.2d 153 (2012) (internal quotations omitted). Suitability to hourly pay is similarly significant because where standardized working hours are impracticable, and work cannot be spread among multiple employees, the job creation goals of the FLSA are not served by enforcement of the overtime wage requirements. *See SmithKline Beecham Corp.*, 132 S.Ct. at 2173.

Here, application of these two factors yields conflicting results. It is undisputed that Plaintiff was not paid a commission or performance bonus. It is also clear that Plaintiff's salary, ranging from $24,000 to $33,000, was not "well above the minimum wage." *SmithKline Beecham Corp.*, 132 S.Ct. at 2173. This suggests finding against application of the exemption. However, Plaintiff's work was ill suited to hourly pay and could not easily be transferred to other employees once Plaintiff reached a forty hour cap. Plaintiff's work schedule varied from day to day, based on the time and location of center meetings and the prospect of recruiting new members. Grameen America's model depends on having a single CM follow members from initial contact to recruitment, and through training to borrowing. These tasks could not be easily transferred to other employees. Because these factors suggest different outcomes, the remaining factors will be determinative.

The amount of time Plaintiff actually spent outside the office is not clearly established. However, if Plaintiff's primary duty was selling loans he would have worked primarily outside of the office, satisfying the third factor. Plaintiff independently solicited new clients on a one-on-one basis with only minimal direct supervision. By Plaintiff's own admission, he was not required to punch in or out of work and did not have clearly set hours. He was also free to determine where to approach potential members. It was only after potential members were organized into a prospective group that more senior staff became involved in Plaintiff's outside sales work. These undisputed facts satisfy the second and fourth factors. Based on this, if Plaintiff's primary duty was selling loans he is an exempt outside salesman.

B.     TCM & CM's Primary Duty As Community Organizer

If Plaintiff's primary duty was as a community organizer, his work falls within the administrative exemption.

The FLSA's overtime pay requirement does not apply to bona fide administrative employees. 29 U.S.C. § 213(a)(1). This exemption only applies to employees who are: "(1) [c]ompensated on a salary…basis…not less than $455 per week…; (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

1. *Base Salary*

The FLSA's administrative exemption only applies to employees who receive a base salary in excess of a $455 per week. 29 C.F.R. § 541.200(a). An employee receives a base salary when he is paid a predetermined amount, at predetermined intervals, "not subject to deductions based on the quality or quantity of the work performed." *Krumholz v. Village of Northport*, 873 F.Supp.2d 481, 487 (E.D.N.Y. 2012); *see also* 29 C.F.R. 541.602(a). The undisputed facts establish that Plaintiff received a base salary. Plaintiff's salary was determined on a yearly basis and directly reflected his job title and length of employment. As a TCM, he received a salary of $24,000 per year. (Pl. R. 56.1 ¶¶ 78-79; Dfs. 56.1 Counter ¶¶ 78-79). Following his promotion to CM, Plaintiff initially earned $30,000 per year. (Pl. R. 56.1 ¶¶ 80-81; Dfs. 56.1 Counter ¶¶ 80-81). This salary was increased annually. (Pl. R. 56.1 ¶ 124; Dfs. 56.1 Counter ¶ 124). In 2010, when Plaintiff became an SS, his salary was reduced to $30,000 per year. (Pl. R. 56.1 ¶¶ 82-83; Dfs. 56.1 Counter ¶¶ 82-83). There is no indication that Plaintiff's salary was ever reduced on the basis of quality or quantity of his work as a TCM or CM.

Under the FLSA, an employee's base salary must exceed $455 per week to qualify for the administrative exemption. 29 C.F.R. § 541.200(a). As a TCM, Plaintiff was paid $24,000 per year, the lowest salary he received during the course of his employment. Even at his lowest salary, Plaintiff earned in excess of $455 per week. As such, the first element of the administrative exemption is satisfied.

NYLL adopts the same definition of "base salary," but imposes a higher minimum weekly salary. 12 NYCRR 142-2.14(c)(4)(ii)(d); s*ee also D'Amato v. Five Star Reporting Inc.*, 80 F.Supp.3d 395, 415 (E.D.N.Y. 2015). Prior to July 24, 2009 NYLL's administrative exemption only applied to individuals paid a salary not less than $536.10 per week. 12 NYCRR 142-2.14(c)(4)(ii)(d). Between July 2009 and December 2014, the minimum weekly salary increased to $543.75 and then $600. *Id.* After December 31, 2014, the minimum weekly salary was further increased to $656.25.

Prior to December 2009, Plaintiff was a TCM earning $24,000 per year, or $461.54 per week. During this period Plaintiff's salary was too low to qualify for the outside salesman exemption. As a CM and SS, Plaintiff's salary ranged between $30,000 and $33,000 per year, or $576.92 and $634.62 per week. Because the record is silent as to when Plaintiff's salary moved within this range, Defendants have not met their burden of establishing his eligibility for this exemption.

2. *Work Directly Related to General Business Operations*

More contentious is the question of whether Plaintiff "perform[ed] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from work on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). In a considering this question, the Second Circuit has reasoned that employees must fall within one of two categories. Employees either "belong[] in the *administrative category*, which falls squarely within the administrative exemption, or as

11

*production/sales work*, which does not."[4] *Davis*, 587 F.3d at 531-32 (emphasis added); *see also Kadden v. Visual Lex, LLC*, 910 F.Supp.2d 523, 535 (S.D.N.Y. 2012) (distinguishing between production and sales). While no hard and fast rule applies, the purpose of an employee's work may be instructive in drawing this distinction. Where the purpose of an employee's work is to facilitate the running of the business, it may properly be classified as administrative. *See D'Amato*, 80 F.Supp.3d at 416. By contrast, work that generates the business' primary output is classified as production. *Id.* The term "production" is not limited to physical goods, extending to those intangibles that constitute an organization's primary output. *See Davis*, 587 F.3d at 532.

Plaintiff argues he sold loans, and that this was strictly production work outside the administrative exemption. (Pl. Br. at 17-18). There is no need to consider whether selling Grameen America loans qualifies as production work. If Plaintiff is correct, his employment can be analyzed under the outside salesman exemption. Only if Plaintiff was primarily a community organizer he will satisfy the second element of the administrative exemption.

Where an employee's work involves an element of sales, the Second Circuit distinguishes between activities intended to attract individual sales - production/sales work - and activities for the purpose of increasing sales generally - administrative work. *See Reiseck*, 591 F.3d at 107 ("[A]n employee making specific sales to individual customers is a salesperson for the purposes of the FLSA, while an employee encouraging an increase in sales generally among all customers is an administrative employee for the purposes of the FLSA."). This framework draws a distinction between "day-to-day sales activities [and] more substantial advisory duties" such as advising clients on available products or guiding the overall business. *Davis* 587 F.3d at 534. Within the financial services industry, employees satisfy "the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products." 29 C.F.R. § 541.203(b).

If Plaintiff is primarily a community organizer, his work will involve facilitating the sale of loans, not through selling an individual product but by attracting members generally. In addition to actually attracting members, Plaintiff is responsible for assessing their financial status, providing training, advising on loan proposals, and ensuring loans are properly utilized. CMs have also testified to providing general business and financial advice and facilitating communication between members. The value and success of these activities cannot be easily quantified and consistent with a job facilitating the general mission of Grameen America.

---

[4] Defendants argue that courts in this Circuit have begun moving away from the administrative v. production/sales analysis, due to the difficulty of application outside traditional manufacturing industries. (Df. Opp. at 2). "The Second Circuit has stated that district courts may continue to use [this distinction] if courts find application of the administrative/production dichotomy useful." *Savage v. Unite Here*, No. 05 Civ. 10812 (LTS)(DCF), 2008 WL 1790402, at *7 (S.D.N.Y. Apr. 17, 2008). I find the distinction useful in this case and so apply it.

Plaintiff argues that Grameen America did measure his work quantitatively, by mandating that he manage a certain number of members at each level. Where performance is measured on the basis of output, it is suggestive of production work. *See Davis*, 587 F.3d at 534 ("While being able to quantify a worker's productivity in literal numbers of items produced is not a requirement of being engaged in production work, it illustrates the concerns that motivated the FLSA."). However, as previously discussed if Plaintiff's work was truly pure sales he would fall within the outside salesman exemption. If Plaintiff's primary duty was organizing members of the community, Grameen America's targets appear based on level of actual activity, not concrete output. Such a finding is consistent with prior cases that have found community organizers within the administrative exemption. *See Savage v. Unite Here*, No. 05 Civ. 10812 (LTS)(DCF), 2008 WL 1790402, at *2-4 (S.D.N.Y. Apr. 17, 2008); *see also Krupinski v. Laborers Eastern Region Org. Fund.*, No. 15-cv-982 (RJS), 2016 WL 5800473, * 7-9 (S.D.N.Y. Sept. 30, 2016) (finding community organizing on behalf of a labor union satisfied the second element of the administrative exemption).

### 3.  *Exercise of Discretion and Independent Judgment*

In addition to the nature of the work performed, the administrative exemption requires that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Thus, the exercise of discretion exists where the employee can make independent decisions without "immediate direction or supervision." 29 C.F.R. § 541.202(c). The fact that these decisions are ultimately reviewed at a higher level does not destroy this independence. 29 C.F.R. § 541.202(c). However minor discretion over the application of well-established procedures is insufficient. *See In re Novartis Wage and Hour Litlg.*, 611 F.3d 141, 156 (2d Cir. 2010). The employee's discretion must be exercised "with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). A matter's significance reflects "the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The regulations provide a non-exhaustive list of factors to consider:

> "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree…; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of

management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

29 C.F.R. § 541.202(b).

Plaintiff argues that he applied well established policies and procedures, and exercised little to no actual discretion. (Pl. Opp. at 15). However, his own testimony demonstrates that Plaintiff regularly performed his community outreach and organization work without direct supervision and with only minimal guidance. Plaintiff testified that he had discretion over when and where to recruit new members, and that he did so without a script or substantial marketing material. In this respect, Plaintiff had "authority to…implement…operating practices." 29 C.F.R. § 541.202(b). Plaintiff further exercised discretion by examining potential member's homes to assess eligibility and in recommending loan reductions. The fact that a Branch Manager conducted GRT and final loan approval speaks to eventual oversight, but does not eliminate Plaintiff's use of discretion. 29 C.F.R. § 541.202(c).

This discretion was used in regard to matters of significance. Plaintiff's discretion impacted who became members and what size loan they received. This work affected Grameen America's "business operations to a substantial degree." 29 C.F.R. § 541.202(b). Plaintiff also "provide[d]…advice to management" regarding whether loans should be issued and how much should be distributed. 29 C.F.R. § 541.202(b). Finally, Plaintiff investigated the use of loan proceeds by borrowers. These facts all speak to the use of discretion in regard to matters of significance. As such, if Plaintiff's primary duty was to act as a community organizer, he falls within the administrative exemption.

### C.   SS Designation

Once he was designated an SS, Plaintiff's primary duty changed and the facts are insufficient to establish if an exemption applies.

During the brief period Plaintiff spent as an SS, he spent considerably more time working in the office. The precise nature of Plaintiff's responsibilities as an SS is disputed. What is not in dispute is that transitioning from a CM to an SS required Plaintiff to reduce the total number of members managed by half, from 400 to 200. This suggests a significant change in his responsibilities, requiring him to focus on new and as yet ill-defined tasks. Based on the magnitude of this change, it seems likely that his new responsibilities became Plaintiff's primary duty.

Because the precise nature of Plaintiff's work as an SS remains disputed, a determination at this stage of litigation is inappropriate. As such, both Plaintiff's and Defendants' motions are denied as they pertain to Plaintiff's work as an SS.

## CONCLUSION

For the reasons stated above, summary judgment is GRANTED to GANY in respect to all claims. Summary is also GRANTED to Grameen America on those FLSA claims deriving from Plaintiff's work as a TCM/CM, but DENIED with respect to Plaintiff's NYLL claims deriving from his work as a TCM/CM and FLSA and NYLL claims deriving from his work as an SS. Plaintiff's motion for summary judgment is DENIED in its entirety.

SO ORDERED.

Dated: April 19, 2017

      Brooklyn, New York

*Ramon E. Reyes, Jr.*

RAMON E. REYES, JR.

United States Magistrate Judge